# In the United States Court of Federal Claims

No. 17-668L
(Filed: April 10, 2020)

*****************************************

| | |
|---|---|
| GEORGE ANDERSON et al., | * |
| | * RCFC 56; Cross-Motions for Summary |
| Plaintiffs, | * Judgment on Liability; Fifth Amendment |
| | * Taking Claim; Rails-to-Trails; Texas Law; |
| v. | * Deed Interpretation; Fee Simple Versus |
| | * Easement; Defeasible Fee; Unavailability or |
| THE UNITED STATES, | * Lack of Conveyance Instrument; Intervening |
| | * Parcels; Intervening Road |
| Defendant. | * |

*****************************************

<u>J. Robert Sears</u>, St. Louis, MO, for plaintiffs.

<u>Lucinda J. Bach</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

Plaintiffs in this Rails-to-Trails case allege that they own real property adjacent to a railroad line in McLennan County, Texas. They contend that the United States violated the Takings Clause of the Fifth Amendment to the United States Constitution by authorizing the conversion of the railroad line into a recreational trail pursuant to the National Trail Systems Act ("Trails Act"), thus acquiring their property by inverse condemnation. The parties filed cross-motions for summary judgment on the issue of liability in which the central dispute is whether plaintiffs possess a property interest in the railroad line. For the reasons articulated below, the court denies plaintiffs' motion for summary judgment and grants in part and denies in part defendant's cross-motion for summary judgment.

## I. BACKGROUND

### A. Statutory and Regulatory Context

During the last century, the United States began to experience a sharp reduction in rail trackage. <u>Preseault v. Interstate Commerce Comm'n</u>, 494 U.S. 1, 5 (1990) ("<u>Preseault I</u>"). To remedy this problem, Congress enacted a number of statutes, including the Trails Act, 16 U.S.C. §§ 1241-1251 (2012). The Trails Act, as amended, provides for the preservation of "established railroad rights-of-way for future reactivation of rail service" by authorizing the interim use of such rights-of-way as recreational and historical trails. <u>Id.</u> § 1247(d). This process is referred to as "railbanking," and is overseen by the Surface Transportation Board ("Board"), <u>id.</u>, the federal

agency with the exclusive jurisdiction to regulate "the construction, acquisition, operation, abandonment, or discontinuance" of most railroad lines in the United States, 49 U.S.C. § 10501(b) (2012).

Before railbanking can occur, the railroad company must seek to abandon its line, either by initiating abandonment proceedings with the Board pursuant to 49 U.S.C. § 10903, or by requesting that the Board exempt it from such proceedings pursuant to 49 U.S.C. § 10502. While considering the railroad company's abandonment application or exemption request, the Board will entertain protests and comments from interested third parties. 49 C.F.R. §§ 1152.25, 1152.29(a) (2015). Of particular relevance in this case, interested third parties may submit requests for the interim use of the railroad line as a trail pursuant to 16 U.S.C. § 1247(d). Id.

If an interested third party submits a trail-use request to the Board that satisfies the requirements of 16 U.S.C. § 1247(d), the Board makes the necessary findings pursuant to 49 U.S.C. § 10502(a) or 49 U.S.C. § 10903(d), and the railroad company agrees to negotiate a trail-use agreement, the Board will issue one of two documents: if the railroad company initiated abandonment proceedings, the Board will issue a Certificate of Interim Trail Use or Abandonment, and if the railroad company sought an exemption, the Board will issue a Notice of Interim Trail Use or Abandonment ("NITU"). 49 C.F.R. § 1152.29(b)-(d). The effect of both documents is the same: to "permit the railroad to discontinue service, cancel any applicable tariffs, and salvage track and materials, consistent with interim trail use and rail banking . . . ; and permit the railroad to fully abandon the line if no agreement is reached 180 days after it is issued, subject to appropriate conditions . . . ." Id. § 1152.29(d)(1); accord id. § 1152.29(c)(1). The Board will entertain requests to extend the 180-day deadline to enable further negotiations. If the railroad company and the interested third party execute a trail-use agreement, then abandonment of the railroad line is stayed for the duration of the agreement. Id. § 1152.29(c)-(d); 16 U.S.C. § 1247(d). If no trail-use agreement is executed, the railroad company is permitted to fully abandon the line. 49 C.F.R. § 1152.29(c)-(d). To exercise its abandonment authority, the railroad company must "file a notice of consummation with the Board to signify that it has . . . fully abandoned the line" within one year of "the service date of the decision permitting the abandonment . . . ." Id. § 1152.29(e)(2). In the absence of a timely filed notice of consummation, the railroad company's authority to abandon the line automatically expires. Id.

If efforts to execute a trail-use agreement are unsuccessful and the railroad company notifies the Board that it has fully abandoned the line, the Board is divested of jurisdiction over the line and ownership of the property encompassing or underlying the line is determined under state law. Caldwell v. United States, 391 F.3d 1226, 1228-29 (Fed. Cir. 2004).

## B. Factual History

Plaintiffs are twenty-four landowners who own real property purportedly adjacent to a railroad line in McLennan County, Texas situated between milepost 2.31 and milepost 4.76 near Waco, Texas.[1] See Pls.' Ex. A at 25-26. The line was acquired, for the most part, in 1902 by

---

[1] The court derives the facts in this decision from the exhibits attached to plaintiffs' motion for summary judgment and supporting briefs ("Pls.' Ex.") and the exhibits attached to

Texas Central Railroad Company ("Texas Central"), Pls.' Ex. E, a predecessor to the current owner of the line, Union Pacific Railroad Company ("Union Pacific"),[2] Pls.' Ex. A at 25.  Texas Central acquired the right of way through various means, Pls.' Ex. E, including, as relevant here, a declaration of trust, id., a court-ordered condemnation, Pls.' Ex. H, and four deeds—the Falkner deed, the George deed, the Brown deed, and the Davis deed, see Pls.' Exs. I-L.  Texas Central constructed its railroad in 1905.  Def.'s Ex. 1 at 4.

In 1967, the railroad line was "reclassified . . . and viewed as an unregulated switching spur" after a long segment of the right of way situated north of the line was abandoned.  Id.

On December 15, 2015, Union Pacific filed a Notice of Exemption with the Board, indicating that it intended to abandon the 2.45-mile-long railroad line on or after February 3, 2016.  Pls.' Ex. A at 25-29.  In the Notice of Exemption, Union Pacific stated that "no local or overhead traffic had moved over the Line for at least two years" and that it intended "to salvage the limited amount of track material on the Line and transfer the right of way to the City of Waco, Texas for a utility corridor and possibly for trail use."  Id. at 26.

On February 2, 2016, the City of Waco filed a late request with the Board for the issuance of a NITU, Pls.' Ex. B, and the Board issued a NITU for the railroad line on February 17, 2016, with an effective date of February 18, 2016, Pls.' Ex. C.[3]  The City signed an agreement with Union Pacific to assume responsibility for the abandoned line on August 10, 2016.  Pls.' Ex. D at 67.  Five days later, Union Pacific filed a Joint Notice of Interim Trail Use/Rail Banking Agreement with the Board.  Id. at 63.

In the meantime, on August 4, 2016, Union Pacific executed a "Deed Without Warranty," conveying its rights in the "strip or tract of land" described therein to the City of Waco.  Pls.' Ex. U.  In the deed, Union Pacific included a reddendum clause reserving the mineral rights for the land and added a covenant that the property must not be used for residential, lodging, educational, or child-care facilities.  Id. at 1-2.  The deed provided that Union Pacific expressly disclaimed any warranty and indicated that any warranties were waived by the City.  Id. at 2.

---

defendant's cross-motion for summary judgment and supporting briefs ("Def.'s Ex.").  For simplicity, the court has removed the "AND" prefix and leading zeros from the page numbers that include them.  Unless otherwise stated, the facts are undisputed.

[2]  Texas Central "was acquired by the Missouri-Kansas-Texas Railroad (MKT) by merger" and Union Pacific "is the successor in interest by merger to the MKT."  Pls.' Ex. A at 25.

[3]  In their briefs and supporting material, the parties accurately state that the Board issued the NITU on February 17, 2016.  However, the Board indicated that the NITU was effective on the date of service, Pls.' Ex. C at 62, and the service date was February 18, 2016, id. at 60.

### C.  Procedural History

On May 22, 2017, plaintiffs filed a complaint—amended on February 13, 2019—
asserting a Fifth Amendment taking.  Plaintiffs allege that the railroad line at issue was operated
upon land granted by deeds conveying only an easement, and that the abandonment of that line
would have unburdened plaintiffs' property but for the operation of the Trails Act.  Plaintiffs
assert that they owned property abutting the line on the date of the alleged taking and that
issuance of the NITU prevented the extinguishment of the railroad company's easement,
resulting in a taking under the Fifth Amendment for which compensation is due.  Plaintiffs
request fair market value for their taken property, including severance and delay damages,
interest, and attorney's fees and costs.

After the conclusion of fact discovery, plaintiffs filed a motion for summary judgment on
the issue of liability, arguing that they have established that Union Pacific held only an easement
in the railroad line, which would have reverted to them, as adjacent property owners, but for the
issuance of the NITU.  Defendant cross-moved for partial summary judgment on liability,
contending that Union Pacific owns the land underlying the line in fee simple and therefore the
issuance of the NITU could not have resulted in a taking of the property interest alleged by
plaintiffs.  Defendant further contends that the parcels owned by certain plaintiffs do not abut the
line and, with respect to certain parcels, that plaintiffs have failed to produce evidence of a
conveyance to Texas Central.  The parties each filed reply briefs and then, at the court's request,
supplemental briefs regarding the nature of the interest conveyed to Texas Central by one of the
deeds at issue.  On April 8, 2020, the court granted the parties' request to cancel oral argument
and issue a decision based on their written submissions.

## II.  STANDARD OF REVIEW

The parties cross-move for summary judgment on the issue of liability pursuant to Rule
56 of the Rules of the United States Court of Federal Claims ("RCFC").  Summary judgment is
appropriate when there is no genuine issue of material fact and the moving party is entitled to a
judgment as a matter of law.  RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be
resolved in favor of either party."  Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine
issue of material fact.  Celotex Corp., 477 U.S. at 323.  The nonmoving party then bears the
burden of showing that there are genuine issues of material fact for trial.  Id. at 324.  Both parties
may carry their burden by "citing to particular parts of materials in the record, including
depositions, documents, electronically stored information, affidavits or declarations, stipulations
(including those made for purposes of the motion only), admissions, interrogatory answers, or
other materials" or by "showing that the materials cited do not establish the absence or presence
of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the
fact."  RCFC 56(c)(1).

-4-

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the court must not weigh the evidence or make findings of fact. See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues."). Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. However, if neither party satisfies this burden on the filing of cross-motions for summary judgment, then the court must deny both motions. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir. 2003) ("When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving reasonable inferences against the party whose motion is under consideration."); Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other.").

## III.  DISCUSSION

### A.  Fifth Amendment Takings and the Trails Act

The Takings Clause of the Fifth Amendment prohibits the taking of private property "for public use, without just compensation." U.S. Const. Amend. V. To establish a taking, a plaintiff must first "identif[y] a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1348 (Fed. Cir. 2013); accord Klamath Irrigation Dist. v. United States, 635 F.3d 505, 520 n.12 (Fed. Cir. 2011) ("It is plaintiffs' burden to establish cognizable property interests for purposes of their takings . . . claims."). To demonstrate a cognizable property interest in a Trails Act case, a plaintiff must establish ownership in land adjacent to the railroad line described in the NITU and that ownership in that land can be traced to the railroad company's acquisition. Brooks v. United States, 138 Fed. Cl. 371, 377 (2018). A plaintiff must also establish that the railroad company acquired an easement for railroad purposes that continued to exist at the time of the alleged taking. Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373 (Fed. Cir. 2009); Preseault v. United States, 100 F.3d 1525, 1533 (Fed. Cir. 1996) (en banc) ("Preseault II"). Specifically, the "determinative issues" are:

> (1) who owns the strip of land involved, specifically, whether the railroad
> acquired only an easement or obtained a fee simple estate; (2) if the railroad

acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and (3) even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).

Ellamae Phillips Co., 564 F.3d at 1373 (citing Preseault II, 100 F.3d at 1533).  In general, state law governs the determination of the property interest acquired by the railroad company.  See Preseault I, 494 U.S. at 8 ("State law generally governs the disposition of reversionary interests . . . .");  Preseault II, 100 F.3d at 1534 ("The question of what estates in property were created by these turn-of-the-century transfers to the Railroad requires a close examination of the conveying instruments, read in light of the common law and statutes of [the state] then in effect.").  Moreover, the acquisition of property rights is governed by the law in effect at the time the rights were acquired.  See Hash v. United States, 403 F.3d 1308, 1315 (Fed. Cir. 2005);  Preseault II, 100 F.3d at 1534.

"[I]f the court concludes that a cognizable property interest exists, it determines whether the government's action amounted to a compensable taking of that interest."  Casitas Mun. Water Dist., 708 F.3d at 1348.  In Trails Act cases, a taking occurs when "government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement."  Ladd v. United States, 630 F.3d 1015, 1019 (Fed. Cir. 2010); accord id. at 1023 ("A taking occurs when state law reversionary property interests are blocked.").  It is well settled that the Board's issuance of "[t]he NITU is the government action that prevents the landowners from possession of their property unencumbered by the easement."  Id. at 1023; accord Barclay v. United States, 443 F.3d 1368, 1374 (Fed. Cir. 2006);  Caldwell, 391 F.3d at 1233-34.

## B.  Texas Law

Plaintiffs assert that Texas Central acquired the right of way at issue through condemnation, deed, and prescription, and that the acquisitions relevant here were accomplished by one of four deeds or through prescription.  To determine the property interests conveyed to Texas Central, the court must examine the acquisitions considering the law in Texas at the time of their execution (deeds) or occurrence (prescription).[4]

---

[4]  For civil cases in Texas, the court with final appellate jurisdiction is the Supreme Court of Texas ("Texas Supreme Court"), which entertains appeals from fourteen regional courts of appeals.  See Tex. Gov't Code Ann. §§ 22.001(c), 22.201(a) (West 2019).  The courts of appeals, in turn, hear appeals from the district and county-level courts within their geographic regions.  Id. § 22.220(a).  Decisions from one court of appeals do not bind its sister courts of appeals.  See Tex. R. App. Proc. 56.1(a)(2) (indicating that the Texas Supreme Court may grant review of a decision if "there is a conflict between the courts of appeals on an important point of law");  Mitchell v. John Wiesner, Inc., 923 S.W.2d 262, 264 (Tex. App. 1996) (remarking that "[t]he opinions of a sister court of appeals are not precedent that bind other courts of appeals").

**1. Deed Construction**

Under Texas law, a court "may construe a deed as a matter of law only if it is unambiguous." ConocoPhillips Co. v. Koopmann, 547 S.W.3d 858, 874 (Tex. 2018); accord Luckel v. White, 819 S.W.2d 459, 461 (Tex. 1991).  Determining whether a deed is ambiguous "is a question of law that must be decided by examining it as a whole in light of the circumstances present when it was executed." Morrison v. Robinson, 226 S.W.3d 472, 475 (Tex. App. 2006).  A deed "is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation." ConocoPhillips Co., 547 S.W.3d at 874. In such circumstances, an issue of fact exists regarding the parties' intent, foreclosing summary judgment.  Id.; Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983).

Only if the court determines that a deed is unambiguous can it proceed to construe the deed "to ascertain the intent of the parties from all of the language within the four corners of the deed." Wenske v. Ealy, 521 S.W.3d 791, 794 (Tex. 2017).  "Even if different parts of the deed appear contradictory or inconsistent, the court must strive to harmonize all of the parts, construing the instrument to give effect to all of its provisions." Luckel, 819 S.W.2d at 461.  If the parties' intent can be ascertained, it prevails over arbitrary or "mechanical rules of construction, such as giving priority to certain clauses over others, or requiring the use of so-called 'magic words.'" Wenske, 521 S.W.3d at 794; accord Luckel, 819 S.W.2d at 463 ("[T]he labels we have given the clauses of 'granting,' 'warranty,' 'habendum' and 'future lease' are not controlling, and we should give effect to the substance of unambiguous provisions."[5]). However, "if deed provisions irreconcilably conflict," a court will "apply one provision to the exclusion of another." Averyt v. Grande, Inc., 717 S.W.2d 891, 893 (Tex. 1986); see also Veltmann v. Damon, 701 S.W.2d 247, 247-48 (Tex. 1985) (per curiam) ("It is well-settled that when there is an irreconcilable conflict between clauses of a deed, the granting clause prevails

---

[5]  A deed traditionally consists of several parts.  At common law, "[t]he premises, which included the granting clause, the naming of the grantor and grantee, the expression of consideration, and a description of the land conveyed, were looked to to supply the grantor, grantee, the consideration, the operative words or words of grant and the description . . . ." Harris v. Strawbridge, 330 S.W.2d 911, 915 (Tex. Civ. App. 1959).  Within the premises, the granting clause contains "[t]he words that transfer an interest in a deed," Granting Clause, Black's Law Dictionary (11th ed. 2019), and is usually followed by the "description," which formally details the boundaries of the land subject to the deed, Legal Description, Black's Law Dictionary, supra.  Following the premises is the habendum clause, which "serve[s] to define the estate granted." Harris, 330 S.W.2d at 915.  "The introductory words to the clause are ordinarily to have and to hold." Habendum Clause, Black's Law Dictionary, supra; see also 4 Tiffany Real Property § 966 n.14 (3d ed. 2018) ("Ordinarily, the 'habendum clause' relates to the quantum of the estate, while the premises and the granting clause designate the grantee and the thing granted.").  The deed may also include a reddendum clause, which reserves rights to the grantor. Dale A. Whitman et al., Law of Property 706 (4th ed. 2019).  A deed often concludes with a warranty of title, which is "[a] warranty that the seller or assignor of property has title to that property, that the transfer is rightful, and that there are no liens or other encumbrances beyond those that the buyer or assignee is aware of at the time of contracting." Warranty, Black's Law Dictionary, supra.

over all other provisions."); <u>Waters v. Ellis</u>, 312 S.W.2d 231, 234 (Tex. 1958) ("It is a recognized rule of construction that where there is a 'necessary repugnance' of clauses in a conveyance, the granting clause prevails over the other provisions of the deed."); <u>Moore v. City of Waco</u>, 20 S.W. 61, 63 (Tex. 1892) (observing that the habendum clause may be rejected if it is repugnant to the other clauses of the deed).

In Texas, railroad companies may, by deed, acquire land for the operation and maintenance of their railroads in fee simple or as an easement.  <u>See</u> 1895 Tex. Rev. Civ. Stat. arts. 4478-4479; <u>Brightwell v. Int'l-Great N. R.R. Co.</u>, 49 S.W.2d 437, 438 (Tex. 1932).  In determining whether a deed conveys a fee simple or an easement, Texas courts examine the use and placement of the phrase "right of way."  In <u>Calcasieu Lumber Co. v. Harris</u>, the Texas Supreme Court recognized that "the words 'right of way' have become descriptive of the land over which a railway runs, to the extent to which the easement extends," but observed that, more generally, "[t]he words 'right of way,' if not defined, are expressive of the very nature of the right ordinarily held by railway companies in the lands over which their roads run; a right to use the land only for railway purposes; an easement."  13 S.W. 453, 455 (Tex. 1890).  Subsequently, in <u>Right of Way Oil Co. v. Gladys City Oil, Gas & Manufacturing Co.</u>, the Texas Supreme Court remarked that "[a]ll authorities agree that the grant of a 'right of way' confers only an easement in the land," but that "land to be used as a right of way may be conveyed in fee; therefore the character of the title conveyed must be determined by the words used and the attending facts and circumstances."  157 S.W. 737, 739 (Tex. 1913).  Texas courts applied the holdings of <u>Calcasieu Lumber</u> and <u>Right of Way Oil Co.</u> over the ensuing decades, and the rule that emerged was described in 1952 by the Texas Supreme Court in <u>Texas Electric Railway Co. v. Neale</u>:

> [A] deed which by the terms of the granting clause grants, sells and conveys to the grantee a "right of way" in or over a tract of land conveys only an easement; and . . . a deed which in the granting clause grants, sells and conveys a tract or strip of land conveys the title in fee, even though in a subsequent clause or paragraph of the deed the land conveyed is referred to as a right of way.

252 S.W.2d 451, 453 (Tex. 1952) (citation omitted).  The Texas Supreme Court further explained that a "declaration in a deed of the purpose for which land is conveyed or the use to be made of it does not impose a condition upon the title granted; nor does it operate to limit the grant to a mere easement."  <u>Id.</u> at 456; <u>accord id.</u> at 454.

If a court determines that a deed conveys an easement, that easement's scope is narrowly construed.  <u>See</u> <u>Marcus Cable Assocs., L.P. v. Krohn</u>, 90 S.W.3d 697, 701 (Tex. 2002) (holding that while "the manner, frequency, and intensity of an easement's use may change over time to accommodate technological development[,] . . . such changes must fall within the purposes for which the easement was created, as determined by the grant's terms"); <u>see also id.</u> ("[I]f a particular purpose is not provided for in the grant, a use pursuing that purpose is not allowed.").  This policy is intended to prevent easements from "effectively becom[ing] possessory, rather than nonpossessory, land interests."  <u>Id.</u> at 702.

## 2. Prescription

In Texas, an easement can also be obtained through prescription.  Prescription, like adverse possession, "permit[s] acquisition of property rights through the passage of time, if certain conditions are met, but prescription is applied to servitudes while adverse possession is applied to possessory estates."  Restatement (Third) of Prop.: Servitudes § 2.17 cmt. a (Am. Law Inst. 2000); see also id. ("To acquire an interest by adverse possession, the claimant must maintain possession of the claimed property during the statutory period.  To acquire a servitude, however, the claimant is only required to use the property during the prescriptive period.").

A railroad company can acquire property rights through prescription.  Int'l-Great N. R.R. Co. v. John T. Brady Corp., 283 S.W. 484, 487-88 (Tex. Comm'n App. 1926, judgm't adopted). Indeed, "in the absence of any testimony on the subject, it cannot be assumed that the [railroad company] acquired from the owner of the fee any other rights except those which the law entitled it to demand from the owner of the fee," Phillips v. Tex. & Pac. Ry. Co., 296 S.W. 877, 880 (Tex. Comm'n App. 1927, holding approved), and railroad companies are entitled by law to demand only an easement from fee owners, see 1895 Tex. Rev. Civ. Stat. art. 4473 ("The right of way . . . to be secured to any railroad company . . . , in the manner provided by law, shall not be so construed as to include the fee simple estate in lands . . . ."); accord 1911 Tex. Rev. Civ. Stat. art. 6532.  An easement acquired through prescription is generally limited to the land that was used for the operation and maintenance of the railroad.  See Int'l-Great N. R.R. Co., 283 S.W. at 488 ("In the absence of anything to designate the exact extent of the boundaries of the right of way claimed [through prescription], it must be confined to the roadbed proper, and such adjacent land as has been used and enjoyed by the railway company, in connection with the roadbed, for the purpose of operating its railway." (quoting Tex. & Pac. Ry. Co. v. Gaines, 27 S.W. 266, 267 (Tex. Civ. App. 1894))); accord District of Columbia v. Robinson, 180 U.S. 92, 100 (1901) ("Relying for right of way on use, the right could not extend beyond the use."), cited in 31A Tex. Jur. 3d Easements & Licenses in Real Property § 43 (2020); see also 1895 Tex. Rev. Civ. Stat. arts. 4425 (providing that a railroad company had "the right to lay out its road not exceeding two hundred feet in width, and to construct the same"), 4445 (allowing railroad companies to obtain land by condemnation "for the purposes of its incorporation or the transaction of its business, for its depots, station buildings, machine and repair shops, or for the right of way, or any other lawful purpose connected with or necessary to the building, operating or running its road"); cf. Allen v. Keeling, 613 S.W.2d 253, 254-55 (Tex. 1981) ("When a road is established by prescription, the right is not limited to the beaten path used, but includes sufficient land, where reasonably available, for drainage ditches, repairs, and the convenience of the traveling public."). "To obtain a prescriptive easement," a railroad company "must use someone else's land in a manner that is open, notorious, continuous, exclusive, and adverse for the requisite period of time."  Brooks v. Jones, 578 S.W.2d 669, 673 (Tex. 1979).  By statute, the requisite time period is ten years.  1895 Tex. Rev. Civ. Stat. art. 3343; accord 1925 Tex. Rev. Civ. Stat. art. 5510; 1911 Tex. Rev. Civ. Stat. art. 5675; Phillips, 296 S.W. at 880.

## C. Interest Acquired by Texas Central by Deed

With respect to most of their claims, plaintiffs assert that Texas Central acquired an easement for its line by deed. Pls.' Mem. Supp. 13-14. Plaintiffs' claims implicate four such deeds—the Falkner deed, the Brown deed, the George deed, and the Davis deed. Id. Plaintiffs contend that these deeds conveyed only an easement because (1) they convey a "right of way" and (2) there would be no reason to convey the right to "take and use" all of the stone, timber, earth, and other material from the land if a fee was being conveyed. Id. at 14. Defendant counters that plaintiffs' claims fail because the railroad company owned the land underlying the railroad line in fee simple. Def.'s Mem. Supp. 7-12. Defendant contends that under Texas law, courts look to the granting clause of a deed to determine the estate it conveys, and if the granting clause states that it conveys a "tract, parcel, or strip of land," then the deed transfers a fee simple interest in the land. Id. at 8-9 (quoting Ybanez v. United States, 98 Fed. Cl. 659, 666 (2011)). Defendant argues that because each of the deeds at issue state that they convey a "piece or parcel" of land, they "clearly establish[] that the Railroad acquired fee simple ownership of the corridor." Id. at 9. Defendant further argues that because the deeds do not mention "right-of-way" in the granting clause, but only in subsequent clauses, such usage does not "limit or change the conveyance of a fee simple estate." Id. at 10-11.

In their reply, plaintiffs urge a holistic reading of the deeds that gives meaning to all of their provisions regardless of where key terms might appear. Pls.' Reply 2-5. In doing so, they contend that each deed's granting clause is divided into two parts, with the description of the land situated in between. Id. Defendant rejects this argument, Def.'s Reply 2-3, as well as plaintiffs' contention that the conveyance of stone, timber, earth, and other material is evidence that the deeds convey easements, id. at 6-8.

### 1. The Falkner Deed

The court first addresses the interest acquired by Texas Central through the Falkner deed, which relates to the claims of George Anderson; Michael and Regina Holleman; Teresa Mays; Lester McDowell (parcel 180695);[6] Tanya Renee Rigsby, n/k/a Tanya Graves; and David Smith. That deed provides:[7]

> That we C. Falkner and wife Emma J. Falkner of the County of McLennan
> State of Texas for and in consideration of Three Thousand Five Hundred
> ($3500.00) Dollars to us in hand paid by The Texas Central Railroad Company a

---

[6] In their amended complaint, plaintiffs allege that Mr. McDowell owns three parcels adjacent to the railroad line. Only one of those parcels (parcel 180695) is affected by the Falkner deed. The other two parcels (parcels 180704 and 180705) are affected by the Brown deed, as are the three additional parcels identified by plaintiffs in their proposed findings of uncontroverted fact and attached claims book (parcels 161808, 161809, and 172002). With respect to the latter three parcels, the court, of course, cannot rule on claims not actually pled.

[7] The court has italicized the description of the land for ease of reference to the surrounding provisions.

-10-

corporation of the County of _____ and State of Texas the receipt of which is hereby acknowledged _____ have granted, bargained, sold and conveyed by these presents do grant, bargain, sell and convey unto the said Texas Central Railroad Company all that piece or parcel of land, situate, lying and being in the County of McLennan, State of Texas, and described as follows: *Being a strip of land 75 feet in width lying immediately west and adjacent to the right of way of the Houston & Texas Central Railroad Company, as the same is now located and established through East Waco and more particularly described as follows: Beginning at the intersection of the east line of Chamberlain Street in said East Waco with the west line of the right of way of the Houston & Texas Central Railroad as the same is now located in East Waco which point is opposite station No __ of the survey line of the Texas Central Railroad from Ross to Waco as now located and established. Thence in a northwesterly direction along the east line of Chamberlain Street to a point where said east line would intersect a line 75 feet from and parallel to the west line of the right of way of said Houston & Texas Central Railroad for corner of this. Thence in a northerly direction on a line 75 feet from and parallel to said west line of the right of way of said H&TC Ry passing over and upon the following blocks viz Blocks 20, 22, 21 and 23 of the Davis addition to East Waco to Davis Street on the north side of said Block 23 and passing said Davis Street and entering the south line of our home place on the Tomas de la Vega survey at point where a line 75 feet from and parallel to the west line of the right of way of said H&TC Ry would intersect our said south line and continuing in a northerly direction 75 feet from and parallel to said west line of right of way of said H&TC Ry over and across our said home place to the north line thereof at station No 94 of the survey of the Texas Central Railroad from Ross to Waco as the same is now located. Thence in a northeasterly direction along our said north line to its point of intersection with the west line of the right of way of said H&TC Ry Thence in a southerly direction along said west line of right of way of the H&TC Ry over and across our said home place and over and across the blocks above named in the Davis addition to East Waco to the point of intersection of said west line of right of way of the H&TC Ry with the east line of Chamberlain Street the place of beginning.* This conveyance is made to the Texas Central Railroad Company for a right of way over and upon which the said railroad company is to construct and operate and maintain its said railroad as the same is now located and established over and upon the above described tracts of land. And the right to take and use all stone earth and other material existing or that may be found within the right of way is hereby granted. It is understood and agreed that the said Falkner hereby secures the right to remove all trees and wood from said land provided the same is removed therefrom on or before 29th day of March 1902: and that the said Falkner shall also remove all houses and other improvements upon said land provided the same are removed prior to April 9th 1902. Said Texas Central RR Co agrees to build a hog proof fence on the west line of right of way hereby granted and have permission to use the wire belonging to said Falkner now strung on the west line of the H&T C Ry Co's fence at said place. It is further agreed and understood that the consideration above named is received and accepted as payment for the above right of way and also in full settlement of all damages

-11-

resulting to the said Falkner by reason of the proper construction operation and maintenance of said Texas Central Railroad on and over said land.  It is further covenanted that if the land herein conveyed shall be permanently abandoned for railroad purposes and cease to be used for right of way as such then the same shall revert to the grantors herein.

        To Have and to Hold the above described premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Texas Central Railroad Company its successors and assigns forever; and we do hereby bind ourselves and our heirs, executors and administrators to warrant and forever defend all and singular the said premises unto the said Texas Central Railroad Company its successor and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

Pls.' Ex. I.

        To determine the intent of the parties, the court begins by examining the deed's granting clause.  That clause reflects that the Falkners agreed to "grant, bargain, sell and convey unto the said Texas Central Railroad Company all that piece or parcel of land" thereafter described.  Id.  Neither the phrase "right of way" nor any other language suggesting an easement appears in the clause.  Thus, the granting clause reflects a fee simple conveyance.

        Plaintiffs, however, contend that this deed conveys an easement based upon the two sentences that appear immediately after the description of the land:

        This conveyance is made to the Texas Central Railroad Company for a right of way over and upon which the said railroad company is to construct and operate and maintain its said railroad as the same is now located and established over and upon the above described tracts of land.  And the right to take and use all stone earth and other material existing or that may be found within the right of way is hereby granted.

Id.  They advance two interrelated arguments in support of their contention.  First, they argue that under the holistic approach to construing deeds favored in Texas, the language that follows the description of the land evinces a clear intent to convey an easement, both due to the use of the phrase "right of way" and to the redundancy of granting a right to take and use certain material from the land if a fee conveyance was intended.  Second, they argue that the granting clause does not end at the beginning of the description of the land, but continues afterwards to include the quoted language.

        Plaintiffs' arguments are not persuasive.  As an initial matter, plaintiffs cite no authority for the proposition that a granting clause can be interrupted by the description of the land.  More importantly, the language they quote does not reflect an intent to convey an easement.  The first sentence merely describes the purpose for which the land would be used, and therefore does not limit the title granted.  See Neale, 252 S.W.2d at 456.  Further, a clear statement in a deed's granting clause is not altered by subsequent references to the land as a "right of way."  See id. at

453. This rule, which is premised on there being a lack of ambiguity in a deed's granting clause, has not been disturbed by the Texas Supreme Court since its articulation, even with the subsequent focus on determining the intent of the parties by examining the four corners of the deed. See BNSF Ry. Co. v. Chevron Midcontinent, L.P., 528 S.W.3d 124, 135 (Tex. App. 2017) ("[W]hile Neale's clause-driven analysis is in tension with the current four-corners approach espoused by Luckel, we, as other courts, will apply the precepts handed down by Neale."); accord id. at 132 n.7. And, although the second sentence of the language relied upon by plaintiffs may be redundant, it can also be read to clarify that Texas Central was entitled only to material that existed within the strip of land, rather than to material from land not conveyed. Regardless, under Neale, it cannot be construed to alter the unambiguous language in the granting clause. Accord id. at 133 n.8 ("Under Neale, the unambiguous granting clause would knock out any contradictory language repugnant to that conveyance, which would mean reading the natural resource right allocation as being a redundancy."). In short, the Falkner deed can be read harmoniously to convey a fee simple rather than an easement.

There is, however, one additional clause in the Falkner deed that deserves attention to ascertain whether plaintiffs retained any interest in the land conveyed by the deed that would have been disturbed by the issuance of the NITU: "It is further covenanted that if the land herein conveyed shall be permanently abandoned for railroad purposes and cease to be used for right of way as such then the same shall revert to the grantors herein." On its face, the clause appears to indicate that the fee simple estate granted by the deed is a defeasible fee.[8]

Texas recognizes defeasible fee conveyances, such as the fee simple subject to condition subsequent and the fee simple determinable.

A fee simple determinable is an estate that automatically terminates on the happening of a stated event and goes back to the grantor. The standard language used to create a fee simple determinable is "for so long as", "while", "during", or "until". The grantor does not have to expressly retain a possibility of reverter. It arises automatically in the grantor as a consequence of his conveying a "so long as" estate, with its built-in time limitation. . . .

A fee simple subject to condition subsequent is created when the grantor retains the power to terminate the estate of the grantee upon the happening of a

---

[8]  Plaintiffs assert that this clause is merely another way to state that the easement granted by the deed will be extinguished when it is no longer being used for the purpose created. Pls.' Supplemental Br. 4. If the deed created a railroad purposes easement, such a clause would be redundant. Moreover, the language used in the clause has been construed to create a reversionary interest for the grantor of a fee estate. See, e.g., Stevens v. Galveston, Harrisburg & San Antonio Ry. Co., 212 S.W. 639, 644 (Tex. Comm'n App. 1919, judgm't adopted) (construing, in a deed conveying a fee simple, the clause "if said premises shall cease wholly to be used for the purposes herein contained, they shall revert to the grantors or their successors" as setting forth a condition subsequent); see also Rogers v. United States, 107 Fed. Cl. 387, 398 (2012) ("It is well recognized that a fee estate may be limited by a proviso that the estate shall expire upon a specified occurrence."), aff'd, 814 F.3d 1299 (Fed. Cir. 2015).

specified event.  Upon the happening of the event, the estate continues until the
grantor exercises her power of termination.  Words such as "upon condition that",
"provided that", "but if", and "if it happens that" are the standard language used
to create a fee simple subject to condition subsequent.  In order to create a fee
simple subject to condition subsequent it is necessary to raise expressly the right
of entry in the grantor; this retained interest does not automatically arise as in the
case of a fee simple determinable.[9]

Crowell v. Tex. A & M Univ. Sys., No. 05-94-01510-CV, 1995 WL 316833, at *5 (Tex. App.
May 25, 1995) (footnote added) (citations omitted).  See generally Howard R. Williams,
Restrictions on the Use of Land: Conditions Subsequent and Determinable Fees, 27 Tex. L. Rev.
158 (1948).  A mere statement of the purpose for which the land being conveyed will be used is
insufficient to create either a fee simple determinable or a fee simple subject to condition
subsequent; an instrument that includes nothing more than such a statement conveys a fee simple
absolute.  Id.  In addition, "when there is doubt from the entire language of the instrument"
regarding whether the instrument conveys a fee simple determinable or a fee simple subject to
condition subsequent,

> the doubt must be resolved in favor of the latter as being in a sense less onerous
> upon the grantee in that, under such a construction, the estate does not terminate
> automatically with the occurrence of the stated contingency, but only after re-
> entry or its equivalent is made by the grantor.

Lawyers Tr. Co. v. City of Houston, 359 S.W.2d 887, 890 (Tex. 1962); accord Couch v. S.
Methodist Univ., 10 S.W.2d 973, 974 (Tex. Comm'n App. 1928) ("The universal rule of
construction of deeds, where there is uncertainty, is to adopt that construction most favorable to
the grantee, for the grantor selects his own language, and the policy of the law frowns upon
forfeitures, conditions, and limitations, and favors the utmost freedom of titles.").  However,
conditions subsequent are also disfavored,

> and the promise or obligation of the grantee will be construed as a covenant
> unless an intention to create a conditional estate is clearly and unequivocally
> revealed by the language of the instrument.  In cases where the intention is
> doubtful, the stipulation is treated as a covenant rather than a condition
> subsequent with the right to defeat the conveyance.

Hearne v. Bradshaw, 312 S.W.2d 948, 951 (Tex. 1958); see also Chi., Tex. & Mexican Cent. Ry.
Co. v. Titterington, 19 S.W. 472, 472 (Tex. 1892) ("[P]romises or obligations of the railway
company referred to in the deed are in the nature of covenants, not conditions, and therefore the
plaintiffs . . . could not reclaim the land itself on account of the nonperformance of the covenants

---

[9]   The future interests retained by the grantor conveying a fee simple determinable (a
possibility of reverter) and a fee simple subject to condition subsequent (a right of reentry) are
reversions.  El Dorado Land Co., L.P. v. City of McKinney, 395 S.W.3d 798, 803 (Tex. 2013);
Restatement (Third) of Prop.: Wills and Donative Transfers § 25.2 & cmts. a-b (Am. Law Inst.
2011).

or promises by the grantee, but would be required to sue for the damages arising from the breach of the contract.").

Under Texas law, the clause in the Falkner deed describes a fee simple subject to condition subsequent.  The plain language of the clause is ambiguous:  It begins with the word "if," which usually signals a condition subsequent, but concludes with language more closely aligned with the possibility of reverter.  Because such ambiguities are resolved most favorably to the grantee, the clause must be construed as setting forth a condition subsequent.  This construction is appropriate even in the absence of language providing for an express right of reentry upon the breach of the condition.  See, e.g., Stevens, 212 S.W. at 644 (construing the clause "if said premises shall cease wholly to be used for the purposes herein contained, they shall revert to the grantors or their successors" and the clause "so long as the said land shall be used as a railroad right of way and if not so used shall revert to the grantors herein" as setting forth conditions subsequent); Jeffery v. Graham, 61 Tex. 481, 482 (1884) (construing the clause "in case of any violation of said last mentioned considerations, then this deed shall be null and void, and said premises shall absolutely revert to said [grantor]" as setting forth a condition subsequent).

Furthermore, the clause in the Falkner deed reserved the benefit of the condition subsequent solely to the Falkners, and not to their heirs or assigns.[10]  See Daggett v. City of Ft.

---

[10]  Precedent from the early 1900s suggests that only a grantor could benefit from a condition subsequent and exercise the right of reentry, at least before the condition was breached. See, e.g., Stevens, 212 S.W. at 644; McBride v. Farmers' & Merchants' Gin Co., 152 S.W. 1135, 1136 (Tex. Civ. App. 1913).  However, more recent precedent from the Texas Supreme Court indicates that the right of reentry is "freely assignable like other property interests."  El Dorado Land Co., 395 S.W.3d at 803.

Furthermore, the court was unable to locate, and the parties did not identify, any precedent holding that subsequent purchasers of adjacent lots (even adjacent lots originally owned by a grantor who reserved a right of reentry) obtain the right of reentry upon the breach of a condition.  Cf. Maddox v. Adair, 66 S.W. 811, 813-14 (Tex. Civ. App. 1901) (explaining that a grantor who conditioned the sale of a lot on the establishment and maintenance of a school on that lot to increase the value of his adjacent land could not recover the lot for breach of that condition after he sold the adjacent land because he no longer had a financial interest in the continued maintenance of a school on the lot).  The sole decision cited by plaintiffs in support of such a proposition, Escondido Services, LLC v. VKM Holdings, LP, 321 S.W.3d 102 (Tex. App. 2010), is unavailing.  That decision concerns the application of the strip and gore doctrine to a mineral estate reserved by the grantor in a deed conveying the surface estate to the State of Texas for use as a public highway.  Id. at 103.  Although plaintiffs attempt to analogize the reserved mineral estate to the reversionary interest at issue here, Pls.' Supplemental Br. 5-6, nothing in the appellate court's ruling suggests that the two scenarios are analogous.  Indeed, Texas Central and its successors in interest held a fee simple interest in the strip of land (unlike the State of Texas in Escondido Services, which held no interest in the mineral estate at issue), and permitting an adjoining landowner to obtain title to that land through the application of the strip and gore doctrine would improperly usurp the fee owner's valid legal title in the land.

-15-

Worth, 177 S.W. 222, 223 (Tex. Civ. App. 1915) ("[U]nless the heir is named, he cannot re-enter, though the condition is breached; the estate does not inure to his benefit.").  But see Watts v. City of Houston, 196 S.W.2d 553, 555 (Tex. Civ. App. 1946) (suggesting, in dicta, that a will bequeathing the residue of an estate could pass a right of reentry to the testator's heirs). Accordingly, if the Falkners did not attempt to reenter the land during their lifetimes, the fee simple estate acquired by Texas Central ripened into a fee simple absolute.  There is no evidence in the record before the court that the Falkners exercised their right of reentry, that the Falkners devised their right of reentry to their heirs (to the extent they were permitted to do so), or that Texas Central or its successors in interest permanently abandoned the railroad line during the Falkners' lifetimes.  Indeed, that Union Pacific deeded the land to the City of Waco in August 2016 suggests that a right of reentry had not been exercised.  Consequently, Union Pacific held title to the land conveyed by the Falkner deed in fee simple absolute, foreclosing the claims of the plaintiffs proceeding under that deed.  The court therefore dismisses those claims.[11]

### 2.  The Brown and George Deeds

The court turns next to the Brown and George deeds, which relate to the claims of Audrey Bables; the Estate of Justo and Clara Beltran; Adele Mary Gadlin; Sherry and Ralph David Holloman; Eunice Jackson; Robert Moore King and Doris J. King, Lester McDowell (parcels 180704 and 180705);[12] Maria Rosa Mendoza; Junior Morgan; Gina Gail Mosely; Eric J. Powers; W.S. Spearman; Lydia C. Weaver; and Charles E. and Apala D. Wilson.  These two deeds contain substantially similar language.  The court therefore examines the deeds together.

The Brown deed provides:[13]

That we E. K. Brown and Mary T. Brown wife of said E. K. Brown of the County of McLennan State of Texas for and in consideration of Four Hundred and Fifty Nine ($459.00) Dollars to us in hand paid by The Texas Central Railroad Company a corporation of the County of McLennan and State of _____ the receipt of which is hereby acknowledged _____ have granted, bargained, sold and conveyed, and by these presents do grant, bargain, sell and convey unto the said Texas Central Railroad Company all that piece or parcel of land, situate, lying and being in the County of McLennan, State of Texas, and described as follows:  *Being a part of the Tomas de La Vega Grant beginning at a point where the west line of the right of way of the Houston & Texas Central Railway Company running from Waco to Ross intersects the south line of our farm and tract of land on which we reside for corner:  thence northward along the west line of the right of way of said H&TC Ry Co to the north line of our said tract of land*

---

[11]  Because the court concludes that the Falkner deed conveyed a fee simple that ripened into a fee simple absolute, it need not address the parties' dispute regarding the effect of an intervening road on the claim of Michael and Regina Holleman.

[12]  See supra note 6.

[13]  See supra note 7.

*a distance of about 3559 feet for corner:  thence in a westerly direction along the north line of our said tract of land to a point where a line perpendicular to the said west line of the right of way would intersect said north line at 75 feet:  thence in a southerly direction 75 feet from and parallel to said west line of the right of way of said H&TC Ry Co to the south line of our tract of land for corner:  thence along our south line in an easterly direction to the place of beginning, the same being a strip of land 75 ft in width immediately adjoining the west line of the right of way of said H&TC Ry Co and extending from station No 93 plus 92.5 feet of the survey line of said Texas Central Railroad Company from Waco to Ross is now located and established to station No 129 plus 51.6 on said survey line and containing about six and 10/100 acres of land.*  This conveyance is made to the said Texas Central Railroad Company for a right of way over and upon which the said Railroad Company is to construct operate and maintain its said railroad as the same is now located and established over and upon the above described tract of land and the right to take and use all timber earth stone and other material existing, or that may be found within the right of way, is hereby granted.

It is further agreed and understood that the said Texas Central Railroad Company shall construct and provide two gate crossings over said railway track at points opposite to the two crossings now maintained over said H&TC Railway Company's tract of land.

To Have and to Hold the above described premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Texas Central Railroad Company its successors and assigns forever; and we do hereby bind ourselves our heirs, executors and administrators to warrant and forever defend all and singular the said premises unto the said Texas Central Railroad Company its successor and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

Pls.' Ex.  J.  The George deed provides:[14]

That we C. J. George and wife F. H. George wife of said C. J. George of the County of McLennan State of Texas for and in consideration of Four Hundred and sixty one and 40/100 dollars ($461.40) to us in hand paid by The Texas Central Railroad Company a corporation of the County of _____ and State of Texas the receipt of which is hereby acknowledged _____ have granted, bargained, sold and conveyed, and by these presents do grant, bargain, sell and convey unto the said Texas Central Railroad Company all that piece or parcel of land, situate, lying and being in the County of McLennan, State of Texas, and described as follows:  *Being a part of the Tomas de la Vega Grant beginning at a point where the west line of the right of way of the Houston & Texas Central Railroad Company running from Waco to Ross intersects the south line of our farm and tract of land on which we reside for corner:  thence northward along*

---

[14]   See <u>supra</u> note 7.

*west line of the right of way of said Houston & Texas Central Railroad Co to the*
*north line of our said tract of land a distance of about 3,573 feet 4 inches for*
*corner:  thence in a westerly direction along the north line of our said tract of*
*land to a point where a line perpendicular to the said west line of the right of way*
*would intersect said west line at 75 feet:  thence in a southerly direction 75 feet*
*from and parallel to said west line of the right of way of said H&TC RR Co to the*
*south line of our tract of land for corner:  thence along our south line in an*
*easterly direction to the place of beginning the same being a strip of land 75 feet*
*in width immediately adjoining the west line of the right of way of said H&TC RR*
*Co and extending from station No 129 plus 51 feet 6 inches of the survey line of*
*said Texas Central Railroad Company from Waco to Ross as now located and*
*established to station No 165 plus 25 feet on said survey line containing about*
*6.152 acres of land.*  This conveyance is made to the said Texas Central Railroad
Company for right of way over and upon which the said railroad company is to
construct operate and maintain its said railroad as the same is now located and
established over and upon the above described tract of land and the right to take
and use all timber earth stone and other material existing or that may be found
within the right of way is hereby granted.

      To Have and to Hold the above described premises, together with all and
singular the rights and appurtenances thereto in anywise belonging unto the said
Texas Central Railroad Company its successors and assigns forever; and we do
hereby bind ourselves our heirs, executors and administrators to warrant and
forever defend all and singular the said premises unto the said Texas Central
Railroad Company its successor and assigns, against every person whomsoever
lawfully claiming or to claim the same or any part thereof.

Pls.' Ex. K.

      A review of the Brown and George deeds reflects that like the Falkner deed, the granting
clauses convey a "piece or parcel of land"; the language following the description of the land
indicates that the land is being conveyed for the construction, operation, and maintenance of a
railroad; and that language is followed by a clause granting Texas Central the right to take and
use all material from the land conveyed. Pls.' Exs. J-K. Therefore, under the analysis set forth
above, the Brown and George deeds conveyed a fee simple estate in the identified strips of land
to Texas Central. Further, because neither deed includes limiting or conditional language
creating a defeasible fee, Texas Central obtained a fee simple absolute. Accordingly, the court
dismisses the claims of the plaintiffs relying on the Brown and George deeds.[15]

---

[15]  Because the court concludes that the Brown and George deeds conveyed a fee simple
absolute, it need not address the parties' dispute regarding whether some of the plaintiffs relying
on these deeds owned land adjacent to the railroad line through adverse possession.

### 3. The Davis Deed

The final deed at issue, the Davis deed, Pls.' Ex. L, affects only the claim of Javier and Valentina Sanchez, see Pls.' Mem. Supp. 6-8. The parties agree that these plaintiffs do not have a property interest in the land underlying the railroad line because their parcel is not adjacent to the line. See Def.'s Mem. Supp. 13-14; Pls.' Reply 9 n.3. The court therefore dismisses the claims of these plaintiffs.

### D. Interest Purportedly Acquired by Texas Central by Prescription

The court next turns to the claims of the plaintiffs—Christopher Donal Estes et ux. ("the Esteses"), Dinna Annetta Patton and Michael Patton ("the Pattons"), Lovie Lee Stanley, and Katie G. Wright—who allege that they own land adjacent to an easement acquired by Texas Central through prescription. See Pls.' Mem. Supp. 6-8, 12. Specifically, plaintiffs contend that Texas Central did not obtain record title to the land that it used to construct these segments of its railroad and that therefore, under Texas law, the only property interest it could acquire in this land was a prescriptive easement for railroad purposes. Id. at 12. They further contend, without providing any supporting evidence, that Texas Central and its successors in interest operated the railroad over the affected parcels for more than 110 years.[16] See id. Defendant objects to plaintiffs' invocation of prescription, arguing that because plaintiffs have not produced documentation of Texas Central's property interests for these segments of the railroad line, they "have not satisfied their burden of proving that the Railroad acquired only an easement in the corresponding segment of the corridor." Def.'s Reply 13. It also asserts that Union Pacific's representation that it owned the line in fee suggests that Texas Central acquired the relevant property in fee.[17] Def.'s Mem. Supp. 16.

### 1. Plaintiffs' Parcels

The Esteses, the Pattons, Ms. Stanley, and Ms. Wright own parcels that were originally platted in the early 1890s, before Texas Central began to acquire land for its railroad line (but after the establishment of a right of way by the Houston and Texas Central Railway Company). Ms. Wright's and Ms. Stanley's parcels were part of the Ashburn Addition of the City of Waco, see Pls.' Ex. M at 347, 378 (modern property records), as depicted on a plat recorded on October 14, 1890, Pls.' Ex. S at 5-6 (plat of the Ashburn Addition). Ms. Wright owns lot 1 of block 11 and Ms. Stanley's parcel comprises lots 9 and 10 of block 8. Pls.' Ex. M at 347, 378. The

---

[16] Plaintiffs rely on Union Pacific's representation that no traffic had passed over the railroad line in the two years prior to its Notice of Exemption, but do not supply any evidence regarding when railroad operations actually ceased on the line.

[17] Defendant relies on Union Pacific's representation in its August 6, 2014 Environmental and Historical Report that its "real property interest in the Line consists entirely of fee title ownership." Def.'s Ex. 1 at 4. However, defendant fails to mention that Union Pacific later represented, in its December 15, 2015 Notice of Exemption, that "[t]he Line proposed for abandonment is approximately sixty percent (60%) non-reversionary property and approximately forty percent (40%) reversionary property." Pls.' Ex. A at 27.

relevant portion of the recorded plat is depicted in the diagram below; the parcels subsequently claimed by Texas Central and the subsequent location of Texas Central's line are superimposed on the diagram.[18]  See Pls.' Ex. F at 3; Pls.' Ex. S at 5-6.



In sum, both Ashburn Street and a portion of lot 1 of block 10 separate Ms. Wright's parcel from the line; and Ashburn Street, lot 4 of block 7, and a portion of lot 5 of block 7 separate Ms. Stanley's parcel from the line.

The parcels owned by the Pattons and the Esteses derive from land described in the will of B.E. Davis and depicted on a plat recorded on March 31, 1892 ("the Davis Addition").  See Pls.' Ex. M at 165, 290 (modern property records); Pls.' Ex. S at 3-4 (plat of the Davis Addition). The Pattons' parcel comprises lot 10, most of lot 11, and roughly half of lot 12 in block 17 (later replatted as lot 15 in block 17), and the Esteses' parcel comprises lots 4 and 5 in block 17.  Pls.' Ex. M at 165, 290.  The relevant portion of the recorded plat and an adjacent portion of the plat of the Ashburn Addition are depicted in the diagram below; the parcels subsequently claimed by

---

[18]  The diagram is not to scale, but the relative placement of the lots, boundaries, streets, and railroad lines adheres to the source documents.  Lot numbers from the plat of the Ashburn Addition are in regular roman type and the parcels owned by Ms. Stanley and Ms. Wright are outlined in bold.  The dashed lines indicate parcels claimed by Texas Central—as set forth in the June 30, 1918 valuation schedule and associated valuation map prepared by Texas Central for the Interstate Commerce Commission—and those parcel numbers are in gray, italic type.

Texas Central and the subsequent location of Texas Central's line are superimposed on the diagram.[19]  Pls.' Ex. F at 3; Pls.' Ex. S at 3-4.



<hr />

[19]  The diagram is not to scale, but the relative placement of the lots, boundaries, streets, and railroad lines adheres to the source documents.  Lot numbers from the plats of the Davis and Ashburn Additions are in regular roman type and the parcels owned by the Esteses and the Pattons are outlined in bold.  The dashed lines indicate parcels claimed by Texas Central—as set forth in a June 30, 1918 valuation schedule and associated valuation map prepared by Texas Central for the Interstate Commerce Commission—and those parcel numbers are in gray, italic type.  With respect to the parcels claimed by Texas Central, the court observes that the map of this area that the parties jointly submitted in Tab 7 of their March 25, 2019 submission includes erroneous boundaries of some of the parcels.  On the valuation map, the boundaries for each parcel are generally depicted by a line broken by two dots ("——— • • ——— • • ———"), but the

In sum, portions of lots 11-14 of block 17 of the Davis Addition separate the Pattons' parcel from the line, and lots 6 and 7 of block 17 of the Davis Addition, along with portions of lots 4 and 5 of block 12 of the Ashburn Addition, separate the Esteses' parcel from the line.

### 2. The Parcels Purportedly Acquired by Texas Central

The diagrams above depict the parcels purportedly acquired by Texas Central to construct and operate a railroad after the recording of the plats of the Ashburn Addition and the Davis Addition. The parcels are described in a valuation schedule and depicted on an associated valuation map prepared by Texas Central for the Interstate Commerce Commission on June 30, 1918.[20]  See generally Pls.' Ex. E at 71-73; Pls.' Ex. F at 3. The valuation schedule identifies,

boundaries on the parties' map diverge from these lines for some parcels (for example, the parties ignore the northeastern boundary of parcel 19). The discrepancy is most evident when comparing the square footage of parcels 23 and 24. According to the valuation schedule, parcel 23 is 9000 square feet and parcel 24 is only 3625 square feet. Pls.' Ex. E at 72. However, on the parties' map, parcel 24 appears to be roughly twice the size as parcel 23. Because of these errors, the court did not rely on the map included in Tab 7.

[20]  On March 1, 1913, Congress enacted a statute, commonly referred to as the Valuation Act, requiring the Interstate Commerce Commission to "investigate, ascertain, and report the value of all the property owned or used by every common carrier subject to" the Act's provisions, including "the original cost of all lands, rights of way, and terminals owned or used for the purposes of a common carrier," as well as "the amount and value of any . . . grant of right of way" and "the grants of land to any such common carrier." Act of March 1, 1913, ch. 92, 37 Stat. 701, 701-02. To implement the requirements of the Act, the Interstate Commerce Commission issued a series of orders in which it directed railroad companies to provide the necessary information on prescribed forms (valuation schedules) and standardized maps (valuation maps). See, e.g., Interstate Commerce Comm'n, Specifications for Maps and Profiles (Jan. 12, 1914) (commonly referred to as the "Map Order," and subsequently revised by Valuation Order No. 5, dated November 21, 1914, and Valuation Order No. 6, dated November 21, 1914); Interstate Commerce Comm'n, Orders, Instructions and Forms Pertaining to Schedules of Land (Nov. 21, 1914) (commonly referred to as Valuation Order No. 7 and modified with supplemental instructions dated November 1, 1916). These orders, as amended, were subsequently codified in parts 151 and 152 of title 49 of the 1938 edition of the Code of Federal Regulations (the year of the Code's inception). Pursuant to the orders—in particular the instructions for preparing the valuation schedule set forth in Valuation Order No. 7, railroad company custodians were required to maintain files containing "each instrument conveying title to or interest in each parcel of land . . . ." Valuation Order No. 7 at 5. The supplemental instructions for preparing valuation schedules provided that (1) "[i]n the absence of deeds to lands owned," the railroad company should refer to "county, parish, or other properly authenticated records" to provide the required information; (2) for any parcels held by the railroad company through adverse possession, an "adverse possession" notation should be included in the "Remarks" column of the valuation schedule; and (3) for any parcels used but not owned by the railroad company, a "not owned" notation should be included in the "Remarks" column of the valuation schedule. Supplemental Instructions ¶¶ 2-4.

among other information, the parcel numbers, the kind and date of the conveyance instrument, the grantor, the size of the parcel, the consideration paid for the parcel, and the date the parcel was dedicated to public use.  See generally Pls.' Ex. E.

For five of the parcels, the instrument was identified as a "Decla[ration] of Trust" dated February 9, 1903, and the grantor was identified as "R.M. Cox."[21]  Id. at 71-72.  For one of the parcels, no instrument was identified, but the grantor was identified as "Mrs. H.I. Sharer."  Id. at 72.  And for two of the parcels, no instrument or grantor were identified.  Id. at 72-73.  None of these parcels had any information listed in the columns describing the book, page, and date of recording.  Id. at 71-73.  The relevant information is summarized in the table below:[22]

---

[21]  The parties sharply disagree regarding the nature of the declaration of trust identified in the valuation schedule.  Plaintiffs assert that the "declaration of trust is not a conveyance instrument," but "is a document or oral statement indicating a property is being held for the benefit of another person," and that "R.M. Cox was not a landowner selling land to the railroad, he was an agent of the railroad itself."  Pls.' Reply 8.  In support of the latter contention, plaintiffs rely on three historical documents: (1) a page from The Railroad Age and Northwestern Railroader, dated October 7, 1898, indicating that "R.M. Cox, who [had] been connected with the Texas Central for a number of years, [was] appointed superintendent of transportation of that road, with headquarters at Waco, Tex."; (2) an excerpt from the Sixteenth Annual Report of the Texas Central Railroad Co., dated 1908, reflecting that R.M. Cox was Texas Central's superintendent; and (3) a page from The Official Railway Equipment Register, circa January 1912, indicating that R.M. Cox was Texas Central's general manager in charge of claims.  Pls.' Ex. T.  Plaintiffs argue that because R.M. Cox worked for Texas Central, he could not have conveyed land to Texas Central.  Pls.' Reply 8-9.

Defendant asserts that the declaration of trust could provide useful information because it might shed light on the nature of the deeds underlying the purported trust, Def.'s Reply 13, and because trustees "may convey, transfer, or encumber the title of the property," id. (quoting Tex. Prop. Code Ann. § 101.001 (West 2019)).  Additionally, defendant argues that plaintiffs' assertion that R.M. Cox was an agent of the railroad is "inadmissible speculation" and, at any rate, plaintiffs proffer no "R.M. Cox Declaration of Trust" from which the court could determine the nature of R.M. Cox's relationship to the railroad or what property rights were conveyed to or from the purported trust.  Id.  Ultimately, the court need not address the parties' contentions regarding the declaration of trust because the parties' cross-motions for summary judgment can be resolved on other grounds.

[22]  In addition to the information in the table, the valuation schedule reflects that for parcels 14, 16, 19, 21, and 23, collectively, the consideration was "4120.96 and 1645.84 Notes assumed," and for parcel 20, the consideration was "125.00."  Pls.' Ex E at 71-72.  No consideration was identified for parcels 24 and 29.  Id. at 72-73.

| Parcel No. | Kind of Instrument | Date of Instrument | Grantor | Area (Sq. Ft.) | Date of Dedication to Public Use |
|---|---|---|---|---|---|
| 14 | Decla. of Trust | 2-9-1903 | R.M. Cox | 13913 | 2-9-1903 |
| 16 | Decla. of Trust | 2-9-1903 | R.M. Cox | 9100 | 2-9-1903 |
| 19 | Decla. of Trust | 2-9-1903 | R.M. Cox | 12700 | 2-9-1903 |
| 20 | | | Mrs. H.I. Sharer | 7295 | |
| 21 | Decla. of Trust | 2-9-1903 | R.M. Cox | 13250 | 2-9-1903 |
| 23 | Decla. of Trust | 2-9-1903 | R.M. Cox | 9000 | 2-9-1903 |
| 24 | | | | 3625 | |
| 29 | | | | 900 | |

Id.

In sum, when the valuation schedule and valuation map are read in conjunction with the recorded plats of the Ashburn and Davis Additions and modern property records, it appears that the Pattons' parcel is separated from the railroad line by parcel 29, a portion of parcel 24, and a portion of parcel 23; the Esteses' parcel is separated from the line by parcel 21, a portion of parcel 20,[23] and a portion of parcel 19; Ms. Stanley's parcel is separated from the line by Ashburn Street and a portion of parcel 14; and Ms. Wright's parcel is separated from the line by Ashburn Street and a portion of parcel 16.

### 3. Effect of Plaintiffs' Failure to Produce any Instruments Conveying Parcels 14, 16, 19, 20, 21, 23, 24, and 29

There is no dispute that Union Pacific received whatever property interest Texas Central held in the railroad line, and that this interest has been in possession of either Union Pacific or its predecessors in interest from the early 1900s until the execution of the trail-use agreement. However, the nature of the property interest acquired by Texas Central in parcels 14, 16, 19, 20, 21, 23, 24, and 29 is unknown because plaintiffs have not produced an instrument conveying an interest in those parcels to Texas Central. Nor have plaintiffs produced any evidence, such as an affidavit reflecting that a title search did not reveal the conveyance to Texas Central, to support their contention that any instrument conveying the land underlying the railroad line to Texas Central has been lost. Rather, the record before the court includes only circumstantial evidence regarding how Texas Central obtained the property at issue—mainly, the information included in the valuation schedule.[24]

---

[23] It is unclear from the valuation map whether parcel 20 extends to the western boundary of lot 5 (represented by the solid line on the diagram) or the eastern boundary of lot 4 (represented by the dashed line on the diagram). For the purpose of the court's analysis, the precise boundary is irrelevant.

[24] As noted above, defendant relies on Union Pacific's representation that it owned the railroad line in fee as evidence that Texas Central acquired the relevant parcels in fee. Def.'s Mem. Supp. 15-16. However, the representation upon which defendant relies is countered by

Plaintiffs' failure to produce direct evidence of a conveyance to Texas Central is not fatal to the claims of the Pattons, the Esteses, Ms. Stanley, and Ms. Wright.  "A deed or other instrument may be proved by circumstances or presumptive evidence, and the tendency of the courts is to extend rather than limit the rule."  Miller v. Fleming, 233 S.W.2d 571, 575 (Tex. 1950).  Moreover, "in the matter of ancient transactions, the parties thereto being dead and no direct evidence available, the authorities draw no distinction between proof of deed by circumstantial evidence and proof of circumstances from which the execution of the ancient instrument may be presumed[.]"  Price v. Humble Oil & Ref. Co., 152 S.W.2d 804, 810 (Tex. Civ. App. 1941).  Indeed, it is "well established that a conveyance of land may be established by circumstantial evidence."  Adams v. Slattery, 295 S.W.2d 859, 868 (Tex. 1956); see also Fair v. Arp Club Lake, Inc., 437 S.W.3d 619, 626 (Tex. App. 2014) ("The doctrine of presumed lost deed or grant, which is also referred to as title by circumstantial evidence, has been described as a common law form of adverse possession.  The purpose is to settle titles where the land was understood to belong to one who does not have a complete record title, but has claimed the land a long time." (citation omitted)).  Furthermore, circumstantial evidence may be used to establish a prescriptive easement.  See Schultz v. Shatto, 237 S.W.2d 609, 614 (Tex. 1951) (citing Ladies' Benevolent Soc. of Beaumont v. Magnolia Cemetery Co., 288 S.W. 812, 815 (Tex. Comm'n App. 1926)).

Consequently, for plaintiffs to establish that Texas Central acquired an easement in the railroad line without producing an instrument reflecting a conveyance to Texas Central, they would need to establish that any such instrument had been lost and then demonstrate that Texas Central and/or its successors in interest operated a railroad "in a manner that [was] open, notorious, continuous, exclusive, and adverse for the requisite period of time."  Brooks, 578 S.W.2d at 673.  Aside from the suggestion that one of Texas Central's successors in interest "reclassified" the line in 1967 and "viewed [it] as an unregulated switching spur," Def.'s Ex. 1 at 4, the record before the court is devoid of evidence regarding the use of the line after Texas Central constructed the railroad in 1905.  Determining the existence of a prescriptive easement is a fact-based inquiry.  See Swilley v. McCain, 374 S.W.2d 871, 876 (Tex. 1964) ("In Texas the presumption of a grant which arises from long possession and enjoyment of property coupled with other corroborating circumstances is one of fact, and as a general rule the trier of fact must determine whether the inference of a grant or conveyance is warranted by the evidence.").  In the absence of evidence regarding the usage of the line that would support plaintiffs' assertion of a prescriptive easement, it would be inappropriate to determine the existence of a prescriptive easement as a matter of law.

### 4. Plaintiffs' Parcels Must Be Adjacent to any Easement Held by Union Pacific

Of course, even if plaintiffs establish that Texas Central acquired an easement through prescription, they must also establish that the parcels owned by the Pattons, the Esteses, Ms. Wright, and Ms. Stanley are adjacent to the railroad line.  Brooks, 578 S.W.2d at 674.  Indeed, if a parcel does not abut the line, then it necessarily follows that the owner of that parcel would

Union Pacific's later representation that it only owned a nonreversionary interest in 60% of the line.  Moreover, Union Pacific's unsupported representations are themselves circumstantial.

have no property interest in the land underlying the line.  Cf. State v. Fuller, 407 S.W.2d 215, 218 (Tex. 1966) ("It is well settled that a deed to land abutting on a railroad right-of-way conveys title to the center of the right-of-way unless the contrary intention is expressed in the instrument." (citing decisions dating back to 1932)).  Defendant argues that even if Union Pacific held an easement over the relevant segments of the line prior to executing the trail-use agreement, these plaintiffs' parcels are not adjacent to the line because they are cut off by intervening parcels and, for the parcels owned by Ms. Stanley and Ms. Wright, an intervening road.  Def.'s Mem. Supp. 16-19; Def.'s Reply 13-15.  Plaintiffs respond that the intervening parcels are part of Union Pacific's easement that were conveyed to the City of Waco to be used as a recreational trail and that the intervening road is an easement that runs across Ms. Stanley's and Ms. Wright's parcels.  Pls.' Reply 14-15.  The court addresses the effects of the intervening parcels and intervening roads in turn.

### a.  Effect of Intervening Parcels

As noted above, Texas Central constructed its railroad across lots that were depicted on recorded plats for the Ashburn Addition and the Davis Addition.  According to the relevant portions of the valuation schedule and associated map, Texas Central claimed an interest in land situated between the railroad it constructed and plaintiffs' parcels, as follows:

| Intervening Portion of Lot(s) on Recorded Plats | Intervening Portion of Railroad Co. Parcel | Affected Plaintiff(s) |
|---|---|---|
| **Ashburn Addition** | | |
| Lot 4 and part of lot 5 of block 7 | Part of parcel 14 | Ms. Stanley |
| Part of lot 1 of block 10 | Part of parcel 16 | Ms. Wright |
| Part of lot 4 of block 12 | Part of parcel 19 | The Esteses |
| Part of lot 5 of block 12 | Part of parcel 20 | The Esteses |
| **Davis Addition** | | |
| Lots 6 and 7 of block 17 | Parcel 21 | The Esteses |
| Parts of lots 13 and 14 of block 17 | Part of parcel 23 | The Pattons |
| Part of lot 12 of block 17 | Part of parcel 24 | The Pattons |
| Part of lot 11 of block 17 | Parcel 29 | The Pattons |

The question is whether these intervening parcels cut off any interest that the Pattons, the Esteses, Ms. Stanley, and Ms. Wright might have in the land underlying the railroad line.

In contending that the intervening parcels are part of the railroad purposes easement, plaintiffs overlook what it means to acquire an easement through prescription (the doctrine they invoke).  Acquisition of a prescriptive easement is dependent on the actual use of the land at issue.  See Robinson, 180 U.S. at 100; Brooks, 578 S.W.2d at 673.  Thus, a railroad company can only acquire a prescriptive easement over land it uses for the purposes of operating and maintaining its railroad.[25]  Accordingly, the boundaries of the parcels purportedly acquired by

_____

[25]  Under early twentieth-century Texas law, a railroad company could, by condemnation, obtain an easement 200 feet in width "to lay out its road" and easements to construct the

Texas Central in the early 1900s do not necessarily provide the boundaries of the prescriptive easement.  Instead, to prove that their parcels are adjacent to the easement, plaintiffs must demonstrate that Texas Central and/or its successors in interest used the full extent of the intervening parcels for railroad purposes for the prescriptive period.

Plaintiffs have not made the necessary showing.  The record before the court lacks any evidence regarding the usage of parcels 16, 19, 20, 21, 23, 24, or 29 during the prescriptive period (presumably, the ten years after Texas Central began operating its railroad).  Additionally, although Union Pacific purported to convey these parcels to the City of Waco in conjunction with their trail-use agreement, see Pls.' Ex. U at 5, the conveyance was made without any warranty regarding the interest held by Union Pacific, and therefore cannot establish that Union Pacific held a railroad purposes easement over those parcels through prescription.  Accordingly, the court will not grant summary judgment to either party regarding whether these intervening parcels cut off the railroad line from the parcels owned by the Pattons, the Esteses, and Ms. Wright.[26]

With respect the remaining parcel—parcel 14—the record before the court includes some evidence of its use.  According to the relevant portion of the valuation schedule, Texas Central acquired a property interest in parcel 14 on February 9, 1903—the date of the declaration of trust and the date the parcel was dedicated to public use.  Pls.' Ex. E at 71; Pls.' Ex. F at 3.  The associated valuation map depicts two buildings on the intervening portion of parcel 14:  a factory and a broom factory.  Pls.' Ex. F at 3.  Modern property records maintained by the McLennan County Appraisal District and the City of Waco indicate that the current owner of parcel 14 (now known as parcel 161862) is the City of Waco, doing business as "Waco Broom & Mop Factory (formerly)."  See Def.'s Mem. Supp. 17 n.5; Def.'s Ex. 4.[27]  Further, the maps in these modern records depict two, unlabeled buildings on the intervening portion of parcel 14.  See supra note 27.  Thus, it appears that from at least June 30, 1918, when Texas Central prepared the valuation map, to some time closer to the present, the intervening portion of parcel 14 was not used for the

---

facilities necessary for railroad operations.  1895 Tex. Rev. Civ. Stat. arts. 4425, 4445; accord 1925 Tex. Rev. Civ. Stat. arts. 6319, 6336; 1911 Tex. Rev. Civ. Stat. arts. 6484, 6504.

[26]  The court recognizes that plaintiffs have the burden of establishing the elements of prescription and therefore it could grant defendant's cross-motion for summary judgment due to plaintiffs' failure to satisfy their burden.  However, the court is reluctant to declare that there are no genuine issues of material fact when the record is devoid of any evidence to support a claim and it appears that such evidence could be produced.

[27]  Defendant indicates in its memorandum that the relevant property records are maintained by the McLennan County Appraisal District and the City of Waco, and describes the information it obtained from those sources in its exhibit.  The data can be accessed at the following websites:  McLennan CAD Property Search, https://propaccess.trueautomation.com/clientdb/?cid=20 (last visited Apr. 9, 2020); City of Waco GIS Service, https://www.arcgis.com/apps/webappviewer/index.html?id=ecd0c145c0934ab1bd97ee8ef34b8cd0 (last visited Apr. 9, 2020); and McLennan CAD Map Search, https://propaccess.trueautomation.com/mapSearch/?cid=20 (last visited Apr. 9, 2020).

purposes of operating and maintaining a railroad.  Indeed, the evidence suggests that the fee owner of the intervening portion of parcel 14 (either Texas Central or the landowner who conveyed an easement in parcel 14 to Texas Central) conveyed the fee estate to the owners of the factories.  Accordingly, plaintiffs cannot establish that Ms. Stanley's parcel is adjacent to the railroad line.  Therefore, the court must grant summary judgment to defendant with respect to Ms. Stanley's claim.[28]

### b.  Effect of Intervening Roads

In addition to being separated from the railroad line by intervening parcels, Ms. Stanley's and Ms. Wright's parcels are separated from the line by Ashburn Street, which was included on the plat for Ashburn Addition recorded on October 14, 1890.[29]  See Pls.' Ex. S at 5-6.  Plaintiffs suggest that Ashburn Street was dedicated to public use with the recording of the plat, see Pls.' Mem. Supp. 17 n.3,[30] and argue that fee ownership of the adjoining parcels extends across the road to the center of the railroad line, id. at 17.

"Texas law recognizes two types of dedication of roads":  dedications under a statute or ordinance and common law dedications.  Jezek v. City of Midland, 605 S.W.2d 544, 548 (Tex. 1980).

> Common law dedications can be either express or implied.  In both instances, there must be an appropriation of land by the owner to public uses, in one case by express manifestation of such purpose and in the other, by some act or course of conduct from which the law will imply such an intent.  A common law dedication of realty to the public does not have to be shown by a deed.  It is evidence of a landowner's intention to dedicate if he permits the public to use his land as a highway.

Id. at 548-49 (citation omitted); accord Ramthun v. Halfman, 58 Tex. 551, 553 (1883) (recognizing the existence of common law dedications in Texas); cf. McLennan County v. Taylor, 96 S.W.2d 997, 998 (Tex. Civ. App. 1936) ("When J. W. Taylor filed the plat of the J. W. Taylor addition to the city of Waco, subdividing the property into lots and blocks and showing streets thereon, this constituted an offer on his part to dedicate such streets to the public

---

[28]  The court further notes that the record does not include any instruments conveying an interest in the intervening parcels at issue to Ms. Stanley, the Pattons, the Esteses, or Ms. Wright.  Nor does it contain any evidence that these plaintiffs obtained an interest in the intervening parcels through adverse possession.

[29]  Because Ms. Stanley's and Ms. Wright's parcels are separated from the railroad line by both intervening parcels and intervening roads, the holding in Ybanez, 98 Fed. Cl. at 668, which concerns only the presence of an intervening road, id. at 664, is inapplicable here.

[30]  Although plaintiffs do not specifically mention Ashburn Street, their reference to roads dedicated in the plat for the Ashburn Addition suggests their intent to include Ashburn Street in their contention.

use.  When he thereafter executed deeds conveying lots with reference to said recorded plat, his offer to dedicate, in so far as he was concerned, became irrevocable, and the organized representative of the public, in this case McLennan county, acquired the right to take possession of the streets shown on the plat when public necessity demanded that they be opened.").  "When a street is dedicated to the public, the governmental entity taking control of the street ordinarily acquires only an easement that it holds in trust for public benefit."  State v. NICO-WF1, L.L.C., 384 S.W.3d 818, 821 (Tex. 2012) (citing Humble Oil & Ref. Co. v. Blankenburg, 235 S.W.2d 891, 893 (Tex. 1951)).  Indeed, "a conveyance of lands bounded on a public highway carries with it the fee to the center of the road as part and parcel of the grant" and adjacent landowners "have the exclusive right to the soil [up to the center of the road], subject to the right of passage in the public."  Mitchell v. Bass, 26 Tex. 372, 380 (1862).

Thus, if the parcels situated between Ashburn Street and the railroad line (the intervening portions of parcels 14 and 16) were held in fee simple by an individual or entity who was not a predecessor in interest to Ms. Stanley or Ms. Wright, then that individual or entity (or a successor in interest) would own to the center of Ashburn Street, cutting off any interest Ms. Stanley or Ms. Wright would have in the line.  Because the uncontroverted evidence in the record suggests that an individual or entity other than Ms. Stanley owns the fee simple interest in the intervening portion of parcel 14, Ms. Stanley's fee ownership extends only to the centerline of Ashburn Street.  In contrast, the record lacks any evidence regarding the fee ownership of the intervening portion of parcel 16, rendering it impossible to determine the extent of Ms. Wright's fee ownership.  Consequently, the court reiterates its grant of summary judgment for defendant with respect to Ms. Stanley's claim and its denial of summary judgment to either party on Ms. Wright's claim.

## IV.  CONCLUSION

For the reasons stated above, the court **DENIES** plaintiffs' motion for summary judgment in its entirety, **DENIES** defendant's cross-motion for summary judgment with respect to the claims of Christopher Donal Estes et ux.; Dinna Annetta Patton and Michael Patton; and Katie G. Wright; and **GRANTS** defendant's cross-motion for summary judgment with respect to the claims of the remaining plaintiffs.  Accordingly, the claims of the following plaintiffs are **DISMISSED**:  George Anderson; Audrey Bables; the Estate of Justo and Clara Beltran; Adele Mary Gadlin; Michael and Regina Holleman; Sherry Diane Brandon Holloman and Ralph David Holloman; Eunice Jackson; Robert Moore King and Doris J. King; Teresa Mays; Lester McDowell; Maria Rosa Mendoza; Junior Morgan; Gina Gail Mosely; Eric J. Powers; Tanya Renee Rigsby, n/k/a Tanya Graves; Javier Sanchez and Valentina Sanchez; David Smith; W.S. Spearman; Lovie Lee Stanley; Lydia C. Weaver; and Charles E. Wilson and Apala D. Wilson.

**By no later than Monday, May 11, 2020**, the parties shall file a joint status report suggesting a schedule for further proceedings regarding the claims of the Esteses, the Pattons, and Ms. Wright.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge